ESTATE OF FRANKLIN A. MORSE, DECEASED, THE FIRST NATIONAL BANK OF SOUTHWESTERN MICHIGAN, ADMINISTRATOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,[1] RESPONDENT

Docket No. 7740–74.    Filed December 6, 1977.

*James F. Thornburg, Stephen A. Seall,* and *Brian J. Lake,* for the petitioner.

*Elsie Hall,* for the respondent.

DRENNEN, *Judge:* Respondent has determined a $30,761.49 deficiency in the amount of Federal estate tax due from petitioner.

The principal issue presented is whether the present value of annual payments of $12,000 per year to the decedent's surviving spouse is deductible by petitioner under section 2053(a)(3), I.R.C. 1954,[1] as a claim against the estate " contracted bona fide and for an adequate and full consideration in money or money's worth" under section 2053(c)(1)(A). Upon resolution of this issue depends the relevance of respondent's assertion that certain check stubs and summaries of expenditures are inadmissible under rule 1006 of the Federal Rules of Evidence. However, we must determine initially whether respondent's reliance at trial upon section 2053(a)(3) and (c)(1)(A) in denying the deduction, instead of section 2043 as averred in the notice of deficiency, constitutes a new matter raised by respondent thereby shifting the burden of proof to respondent under Rule 142(a), Tax Court Rules of Practice and Procedure.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Franklin A. Morse (hereafter referred to as Franklin) died a resident of Niles, Mich., on March 16, 1972. The First National Bank of Southwestern Michigan is the duly qualified administrator of his estate.

Franklin was a successful life insurance agent associated principally with the Northwestern Mutual Life Insurance Co. He lived in South Bend, Ind., with his first wife until she died in 1960. He continued to live in South Bend until he moved to Niles, Mich., as recited below.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise specified.

[2] The notice of deficiency refers to sec. 2043 in denying the deduction but actually should refer to sec. 2043(b) because the denial is based upon relinquishment of marital rights being insufficient consideration.

Lucile H. Zimmer (hereafter referred to as Lucile), a longtime family friend of Franklin, resided with her first husband, Henry W. Zimmer, in Niles, Mich. Zimmer was a successful corporate executive of a corporation in Niles. At his death in 1962, Lucile became the income beneficiary of two trusts, trust A and trust B, established by Zimmer. Trust A was a marital deduction trust and the entire net income thereof was to be distributed to Lucile. The net income of trust B was also to be distributed to Lucile during her life, provided that if the trustee determined that she did not need it, the income could be distributed to settlor's descendants. Upon Lucile's death trust B was to be distributed to settlor's descendants. The trust agreement had been amended to provide for the distribution of the remaining principal in trust B to or for the benefit of the Zimmer children if Lucile remarried.

Lucile was given the right by the Henry Zimmer trust agreement to appoint a successor corporate trustee. Lucile exercised that right by appointing the First National Bank of Niles, Mich., on September 3, 1963.[3]

Sometime after Zimmer's death Lucile and Franklin's friendship developed into courtship. Franklin proposed marriage in early 1964 but for various personal reasons Lucile decided against it at that time. In the course of their discussion, however, they began making a disclosure to each other of their respective property interests. Negotiations were complicated by the substantial property rights involved and by the fact that Lucile, upon remarriage, would forfeit her rights in the Henry Zimmer trust B. The annual distributions to Lucile from trust B for the years 1965–67 averaged about $12,000. Franklin offered, in the event of their marriage, to make arrangements to reimburse Lucile for the lost income from trust B if Franklin predeceased her.

Lucile owned a residence at 901 Sassafras Lane in Niles and a vacation home at Walloon Lake, Mich. Although Franklin owned a home in South Bend, he told Lucile that he would be reluctant to take her away from her home and friends in Niles. Lucile responded that they could live in her home in Niles if they

---

[3]At some time prior to the filing of the petition in this case this bank's name was changed to the First National Bank of Southwestern Michigan, petitioner herein.

married. Lucile never thought of asking him to pay rent if he lived in her home.

Despite the decision against marriage in 1964 Lucile and Franklin continued to see each other over the next 3 years. During this time there was an understanding that if marriage did occur, their primary residence would be Lucile's home in Niles.

In 1965 Franklin sold his home and moved into an apartment in South Bend.

The couple decided to marry in March 1967. It was assumed by them that Franklin would implement his promise to reimburse Lucile for the income lost from trust B in the event he predeceased her. It was also assumed that he would reside in Lucile's home.

Sometime in March or April 1967, Franklin and Lucile visited the law offices of James F. Thornburg for the purpose of formalizing in an antenuptial agreement their understandings as to the various property arrangements. Thornberg represented Franklin in these negotiations.

Prior to this meeting, Thornburg had consulted with Franklin concerning the understandings already reached by the couple. Thornburg was advised that they had agreed that Franklin would relinquish his apartment in South Bend and that the couple would establish their primary residence at Lucile's home in Niles. Thornburg advised Franklin that he should obtain a life estate in the Niles residence in the event Lucile predeceased him.

At the meeting in Thornburg's offices at which Franklin and Lucile were present to discuss formalization of the antenuptial agreement, there was a discussion concerning the fact that Franklin was going to provide Lucile with income lost from trust B in the event that he predeceased her. After this discussion, Thornburg then addressed Lucile and stated in substance: "I would be very remiss if I did not ask what you are doing for Steve [Franklin] in return." Franklin had been concerned that Thornburg's suggestion of a life estate in the Niles residence might interfere with the impending marriage, but he did not protest when Thornburg made his statement to Lucile. Lucile, very upset by Thornburg's remark, consulted the next day with the president of petitioner and Donald F. Walter, the trust officer who had handled the Zimmer trust since 1963. Because of their long association and frequent consultations Lucile relied on

Walter's advice concerning her financial arrangments. During the ensuing negotiations to finalize the antenuptial agreement, Walter, although not technically acting as her attorney, was protecting Lucile's interests.

After this consultation Lucile decided to grant Franklin a life estate in the Niles residence and its furnishings if she predeceased him.

The antenuptial agreement was executed on April 27, 1967, in Thornburg's and Walter's presence. It provides in relevant portion:

And in that each has separate and independent property and estate [from their prior marriages], the general character and extent thereof having been disclosed by each to the other, and in that both are familiar with the interests in the property of the other which the law, in the absence of this agreement, would invest in each upon the prior demise of the others;

And further in that both parties desire to own, possess, manage, control and make disposition during life and at death of their separate property and estate independently one of the other in like fashion and extent as though marriage had not intervened; which mutual desire is based primarily on the reasons following:

(a) Existing business relationships with extraneous persons would or might be adversely affected during the lifetime of these parties through disabilities and impediments of management and transfer incident to coverture, which disabilities, were it not for this agreement, might serve to impair the prosperity of these parties during marriage; and

(b) To promote the welfare and happiness of this contemplated marriage by this express understanding as to the legal position of each in case of the death of either, and thereby avoid the sources of potential friction and disunity between and embarrassment and annoyance to these parties during life; and

(c) After the demise of one, to avoid within human limitation all controversy; and

(d) To give proper recognition to the fact that the respective estates of the parties were acquired without assistance or collaboration of the other;

Now, THEREFORE, the parties hereto do each, in consideration of marriage and of the covenants of the other hereinafter contained, covenant and agree as follows:

1. That at all times during their coverture, each of the parties hereto with respect to their separate property and estate, both real and personal and whether now owned or hereafter at any time acquired and irrespective of the source from which acquired, shall have and be at unqualified liberty to exercise all and every of the rights, powers, privileges and immunities in and to his or her said separate property and estate in the same manner and to the same extent as though their marriage had not occurred, including * * * .

\* \* \* \* \* \* \*

2. Each of the parties does hereby agree that, in the event of the demise of either, the party who survives the demise of his or her spouse forever shall

forego and be barred from and does now forever release, remise, disclaim, waive and renounce any and all interests, property, rights and claims whatsoever which he or she does, might or could have or assert in and to the property and estate of the deceased spouse, which property and estate of the deceased spouse thus freed of the rights and claims of the surviving spouse shall include all realty and personalty wheresoever situated now owned or at any time hereafter acquired from any source by the deceased spouse or in which the deceased spouse at his or her demise may have an interest or over which the deceased spouse at his or her demise may have a power of disposition and this release and waiver by each includes, but not by way of limitation, the release and waiver of any and all rights of dower, courtesy [sic], statutory rights in lieu of or in the nature of dower and courtesy [sic], rights arising from heirship or descent, rights and claims (statutory and otherwise) arising in favor of a surviving spouse, homestead, quarantine, widow's award and allowance, community property rights and rights or claims to any expectancy as a presumptive heir; provided, however, that nothing in this Paragraph 2 shall be construed to waive or release such rights, if any, as are granted to a surviving spouse by the following paragraphs of this agreement.

3. The First Party agrees that, if such contemplated marriage takes place, he theretofore or promptly thereafter will make provision either by his last will and testament, by inter vivos trust or trusts, or by appropriate designation of beneficiary under a life insurance contract or contracts on his life, or by other media efficacious to the purpose, the selection of the medium or media to be used to the purpose being in the sole discretion of First Party, in such manner and fashion that, if First Party dies prior in time to the demise of Second Party and Second Party shall then be his widow, the entire then taxable estate of First Party (the term "taxable estate" being defined as that term presently is defined in the Internal Revenue Code of 1954, as amended), minus, however, all transfer, inheritance and estate taxes of any kind and nature, both state and federal, and minus also any and all tangible personal property which is not a business asset or investment for income or profit, shall be used in such manner that not to exceed Twelve Thousand Dollars ($12,000.00) per annum of the net income therefrom shall be paid to or used for the benefit of Second Party for and during her natural life; provided, however, that if in any calendar year (with periods of less than a calendar year to be prorated) the net income therefrom shall be less than Twelve Thousand Dollars ($12,000.00), principal or corpus shall be used, if requested in writing by the Second Party, to such extent as is necessary to provide Second Party with principal plus income equalling Twelve Thousand Dollars ($12,000.00) per annum. * * * First Party at his election may fulfill and satisfy the requirements hereof, in part or in whole, by inter vivos transfers to Second Party of any kind or nature. * * *

4. Second Party shall be under no obligation of any character to make any provision in her will for or in favor of First Party, excepting only that if First Party survives Second Party and is then her widower, Second Party agrees that First Party shall have a life estate, for and during his natural life, in and to the following described residential real estate or such other residential real estate which then represents the primary place of residence of the parties hereto, irrespective of the location thereof:

The South 70 feet of Lot 31 and the North 55 feet of Lot 32, Arrowhead's Addition to the City of Niles, Berrien County, Michigan.

\*    \*    \*    \*    \*    \*    \*

6. Nothing contained in this agreement shall abrogate or diminish such obligations of support and maintenance during coverture as at any given time during coverture may be imposed by applicable law.

Lucile executed a first codicil to her will on April 28, 1967, which provides in relevant portion:

In the event that * * * Franklin A. Morse shall survive me as my widower, I give and devise to him for and during his natural life, the residential real estate, together with its improvements, commonly known as 901 Sassafras Lane, Niles, Michigan, * * * but if such real estate is hereafter disposed of and I then own other and different real estate, irrespective of where situated, constituting our principal place of family residence, then I give and devise to * * * Morse for and during his natural life such other and different real estate so constituting our then primary place of residence. In addition to the foregoing, I further give and bequeath to * * * Morse the use for and during his natural life or for such shorter interval as he may desire to use the same, of the household furnishings, furniture, fixtures and other items of non-business tangible property normally contained in or upon said premises and conventionally used in conjunction therewith, all in such manner and fashion that for and during his natural life he shall have the usage and benefit of the same as a furnished residential accomodation. * * *

Franklin complied with the antenuptial agreement by creating on April 27, 1967, an irrevocable trust and by executing his will on April 28, 1967. The living trust provided that the trustee should pay to Franklin during his natural life all of the net income of the trust. After making reference to Franklin's contemplated marriage to Lucile, the trust provided that after Franklin's death, if she survived him, the trustee should pay to Lucile out of the net income of the trust during her life $12,000 per year, any excess thereof to go to his children. Franklin's will, after making provision for payment of debts and taxes, devised the remainder of his estate to the living trust, to be administered in accordance with the terms thereof.

Franklin gave up his apartment in South Bend and after their marriage on April 29, 1967, moved into the Niles residence where he lived until his death on March 16, 1972. After their marriage the couple vacationed at Lucile's Walloon Lake residence for about 6 or 7 weeks every summer.

During their marriage the couple maintained separate checking accounts. Lucile paid the majority of the real estate taxes,

insurance premiums, and other maintenance expenses on the Niles and Walloon Lake residences with checks drawn on her separate checking account. She also paid telephone bills relating to these residences from this account. Franklin paid some of the living expenses and also gave money to Lucile at times that was deposited in her account.

The First National Bank of Southwestern Michigan, administrator of Franklin's estate, deducted on the Federal estate tax return as a debt of the decedent the present value, $110,387, of Lucile's right as beneficiary of the trust established by Franklin to receive $12,000 annually for the remainder of her life. The stated "consideration for said payments was the forfeiture by decedent's surviving spouse of her rights to income from a different and unrelated trust created by the deceased first husband of said surviving spouse in amounts approximately equivalent to that provided by the decedent under the antenuptial agreement." This deduction was disallowed in the notice of deficiency "since the obligation was not incurred for adequate and full consideration in money or money's worth as required under section 2043 of the Internal Revenue Code."

## OPINION

As a threshold matter petitioner argues that respondent's reliance at trial upon section 2053(a)(3) and (c)(1)(A)[4] as the basis for denying the deduction instead of section 2043,[5] as referred to

---

[4]Sec. 2053 provides in relevant portion:

(a) GENERAL RULE.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—

\* \* \* \* \* \* \*

(3) for claims against the estate, \* \* \*

\* \* · \* \* \* \* \*

(c) LIMITATIONS.—

(1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) \* \* \*

(A) CONSIDERATION FOR CLAIMS.—The deduction allowed by this section in the case of claims against the estate \* \* \* shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; \* \* \*

(e) MARITAL RIGHTS.—

For provisions that relinquishment of marital rights shall not be deemed a consideration "in money or money's worth," see section 2043(b).

[5]Sec. 2043 provides:

(a) IN GENERAL.—If any one of the transfers, trusts, interests, rights, or powers enumerated and described in sections 2035 to 2038, inclusive, and section 2041 is made, created, exercised, or relinquished for a consideration in money or money's worth, but is not a bona fide sale for an

in the notice of deficiency, constitutes new matter which operates to shift the burden of proof to respondent on that issue. While a notice of deficiency is presumed correct, and a petitioner has the burden of disproving its correctness, when respondent departs from the grounds relied on in his notice of deficiency to sustain a theory later raised, he has the burden of proving any new matter raised. *Tauber v. Commissioner*, 24 T.C. 179, 185–186 (1955); *Wilson v. Commissioner*, 25 T.C. 1058, 1066 (1956); Rule 142(a), Tax Court Rules of Practice and Procedure.

However, even though respondent made reference to section 2043 in the notice of deficiency and now relies on section 2053(c)(1)(A) for disallowance of the claim, the underlying theory upon which disallowance of the claimed deduction is based remains unchanged. In the notice of deficiency the deduction was disallowed because it was not incurred for adequate and full consideration in money or money's worth—as required in section 2043. Section 2043(a) provides for inclusion in the gross estate of portions of property or rights transferred before death for a consideration but in a transaction that is not a bona fide sale for an adequate consideration in money or money's worth, and section 2043(b) provides that relinquishment of marital rights shall not be considered a consideration in money or money's worth. Section 2053(a)(3) provides for a deduction from the gross estate for claims against the estate but subsection (c)(1)(A) limits the deduction to claims contracted bona fide and for a full and adequate consideration in money or money's worth. Subsection (e) also provides that marital rights shall not be deemed consideration in money or money's worth, making reference to section 2043(b). Since the deficiency resulted from a disallowance of a claim against the estate, section 2053 had to be the section involved and the reference in the notice of deficiency to section 2043 was simply to the language relating to adequate consideration, which is the same in both sections. Petitioner, as reflected in its petition, was fully

---

adequate and full consideration in money or money's worth, there shall be included in the gross estate only the excess of the fair market value at the time of death of the property otherwise to be included on account of such transaction, over the value of the consideration received therefor by the decedent.

(b) MARITAL RIGHTS NOT TREATED AS CONSIDERATION.—For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth."

aware that the deduction was disallowed because not incurred for full and adequate consideration in money or money's worth—regardless of the section reference. Petitioner's argument is therefore without merit.[6]

We now move to the crucial issue in this case. Because the claim is founded upon a promise or agreement, whether the present value of Lucile's right to receive $12,000 per year for the remainder of her life from the trust established by Franklin is deductible by his estate as a claim against it under section 2053(a)(3) is dependent on a determination of whether Franklin "contracted bona fide and for an adequate full consideration in money or money's worth" for this promise as provided by section 2053(c)(1)(A).

The underlying purpose of this section is to prevent the making of what are in substance tax-free testamentary dispositions through the medium of contractual claims. *Estate of Pollard v. Commissioner*, 52 T.C. 741, 744 (1969). A tax avoidance motive need not exist; it is the substance of the arrangement as a potential device for defeating the estate tax that is of controlling significance. *Estate of Pollard v. Commissioner*, *supra* at 745.

Apparently recognizing that Lucile's promise to bestow upon Franklin a life estate in the primary residence and its furnishings if she predeceased him is essentially a testamentary disposition and would not qualify as "full and adequate consideration in money or money's worth" under section 2053(c)(1)(A) (see *Estate of Pollard v. Commissioner, supra* ), petitioner argues that Franklin's "right" to live rent free in Lucile's residences during their marriage without responsibility for maintenance expenses constitutes sufficient consideration to satisfy the statutory requirement.[7]

Respondent challenges this assertion on two fronts. He contends that the couple's living arrangements during their marriage were not the subject of a bona fide contract as that phrase has been defined. Furthermore, even if a bona fide

---

[6]Petitioner has apparently changed its theory several times since the estate tax return was filed with regard to what constituted the consideration for decedent's agreement to pay Lucile $12,000 per year after his death.

[7]Despite the supporting statement in the estate tax return as set out in our findings of fact, petitioner does not argue that the detriment to Lucile of losing her right to the income from the Zimmer trust B qualified as consideration for Franklin's agreement to provide her with $12,000 income after his death. See *Commissioner v. Wemyss*, 324 U.S. 303 (1945).

contract with regard to the living arrangements is found, that the asserted consideration does not meet the statute's requirement that it be full and adequate.

Evident from the record is the conclusion that respondent's first contention is correct. It is obvious that a consideration hypothetically full and adequate within the statutory meaning has no relevance if the asserted consideration was not part of the bargain between the parties. Such is the case here. Petitioner's attempt to skim over the necessity for a bargained and conscious exchange between the couple by referring to subtle, unstated might-have-beens ignores the existence in the statute of the phrase "bona fide contract."

That phrase is defined in section 20.2043-1(a), Estate Tax Regs., referred to by sec. 20.2053-4, Estate Tax Regs., as a sale made in good faith. Judicial decisions refer to it as an arm's-length transaction or a bargained-for exchange. *Bank of New York v. United States,* 526 F.2d 1012 (3d Cir. 1975); *Estate of Goetchius v. Commissioner,* 17 T.C. 495, 503 (1951); *Mollenberg's Estate v. Commissioner,* 173 F.2d 698, 701 (2d Cir. 1949); see also *Commissioner v. Wemyss,* 324 U.S. 303 (1945). As explained in *Mollenberg's Estate v. Commissioner, supra,* "The word 'sale' means an exchange resulting from a bargain, one in which the beneficiary gives or the grantor receives something of money value or a binding promise." In intrafamily transactions, the element of bargain is subject to close judicial scrutiny. *Estate of Woody v. Commissioner,* 36 T.C. 900, 903 (1961). Although obviously not family at the time the antenuptial agreement was executed, the couple's relationship and intentions justify imposition of this standard of examination. Even so, a close relationship should not necessarily preclude a deduction under section 2053.

Even a family agreement, although achieved without apparent bitterness, has been regarded as bargained for when members of the family had interests contrary to those of other members of the family. Where legal rights of family members are in conflict, each member may have to surrender rights he would otherwise keep in order to secure rights that he wishes to obtain. To classify this sort of family arrangement as an arm's length bargain seems within the compass of reasonableness. [*Bank of New York v. United States, supra* at 1017. Fn. ref. omitted.]

However, an examination of the facts and circumstances of this case reveals an absence of bargaining between Lucile and

Franklin for the reciprocal rights asserted by petitioner. Initially, Franklin's promise to reimburse Lucile at his death for the trust income she would lose upon her remarriage was gratuitous. No inference of a quid pro quo for this promise can be drawn from Lucile's offer to use her residence as their home if they married. Her offer was a spontaneous and gratuitous reaction to Franklin's concern that their marriage would uproot Lucile and sever her longstanding personal ties in Niles. Nothing in the record indicates that Franklin's expression of concern was calculated to elicit this offer or to gain the privilege of living without any financial obligations in Lucile's homes. Lucile testified that the question of rent for her offer was neither thought of nor discussed by them.

Furthermore, the record reveals no discussion between the couple regarding responsibility for maintenance expenses on Lucile's residences during their marriage. Assuredly, Franklin did not pay Lucile any rent and perhaps he did not contribute in any significant manner to the upkeep of the two homes.[8] However, we cannot infer simply from this negative that Lucile had intended otherwise until Franklin promised to reimburse her for her lost trust income at his death. Petitioner's argument that hard bargaining as would occur between hostile parties is not an absolute prerequisite to a deduction under section 2053 has validity. But its supposition that proof of a full and adequate consideration renders moot any discussion of a bargained-for exchange is less well taken. Clearly, in many, if not most, instances the elements of bargain and consideration will be undistinguishable. When, however, the asserted consideration was never mentioned as such by the parties in their negotiations nor reflected in the document drafted to implement their reciprocal promises, a definite, and in this case, insurmountable distinction becomes apparent. If a person has never thought of particular rights, it is obvious that she also could not give them to another. Petitioner's repeated references to unstated subtleties in the discussions between the couple and to the probabilities, in petitioner's view, of what Franklin's understanding of Lucile's offer to use her homes during their marriage meant to him economically are insufficient to sustain its burden of

---

[8] The record is not clear on this.

proving that the asserted consideration was indeed the consideration with which we need be concerned.

As noted, another indication that the asserted consideration was not part of the bargained-for exchange of rights between the couple is its absence from the provisions of the antenuptial agreement. This document, carefully drafted and examined by the couple and their representatives, makes no mention with regard to rental or maintenance obligations on Lucile's homes during their marriage. The only provision from which the inference desired by petitioner is remotely conceivable is the one in which the couple's premarriage property interests are to be maintained as their separate properties post marriage. But if Franklin had bargained for and obtained rights with regard to Lucile's homes, we believe this would have been reflected explicitly in the antenuptial agreement. Consequently, we decline to accept for lack of proof petitioner's argument. In fact, it seems rather obvious that the reason Franklin agreed to have the trust pay Lucile $12,000 per year after his death was to reinstate after his death the flow of income from the Zimmer trust B that she relinquished because of her marriage to Franklin. If this reason is deemed to be the consideration for Franklin's agreement, it is not the type of consideration that would qualify as consideration in money or money's worth under section 2053(c)(1)(A). See *Commissioner v. Wemyss, supra.*

Because of our conclusion we need not reach the question whether this asserted consideration is full and adequate as that phrase has been explained by case law. Nor need we examine the admissibility of Lucile's check stubs and summaries under Rule 1006 of the Federal Rules of Evidence.[9]

Moreover, our conclusion obviates any discussion of the issue of partial deductibility under section 2053. The only remaining elements of consideration for Franklin's promise are Lucile's grant of a life estate in her Niles residence and its furnishings contingent upon her prior death and her waiver of any marital rights otherwise accruing to her in Franklin's property. Clearly, those promises, maturation of which were dependent upon the prior death of the promisor, are nothing more than testamentary dispositions of property. As noted, section 2053(c)(1)(A) is

---

[9] Also rendered irrelevant by our decision is petitioner's request on brief that we take judicial notice of the rental value of the Walloon Lake residence.

designed to prevent the avoidance of the estate tax by this sort of arrangement. Lucile's waiver of her marital rights is specifically removed from the category of statutory consideration by sections 2043(b) and 2053(e). From this result it is apparent that the claim against Franklin's estate is unsupported by any consideration recognizable under the estate tax provisions. Consequently, respondent's determination of the deficiency is upheld.

*Decision will be entered under Rule 155.*