UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 93-1602

 ESTATE OF ELIZABETH G. HUNTINGTON, DECEASED,
 NANCY H. BRUNSON, ADMINISTRATRIX,

 Petitioner, Appellant,

 v.

 COMMISSIONER OF INTERNAL REVENUE,

 Respondent, Appellee.

 

 APPEAL FROM THE UNITED STATES TAX COURT

 [Hon. Stephen J. Swift, U.S. Tax Judge]
 

 

 Before

 Selya, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Cyr, Circuit Judge.
 

 

 Michael E. Chubrich for appellant.
 
 Annette M. Wietecha, with whom Gary R. Allen, Ann B. Durney, and
 
Michael L. Paup, Acting Assistant Attorney General, were on brief
 
for appellee.

 

 February 23, 1994
 

 COFFIN, Senior Circuit Judge. Charles and Myles Huntington
 

claim that their stepmother, the decedent, promised as part of a

reciprocal will agreement with their father that she would devise

her estate in equal shares to them and their stepsister.

Decedent died intestate, leaving the sons without an inheritance.

Their claim against her estate ultimately led to a $425,000

settlement. The question posed by this appeal is whether the

estate may deduct the settlement amount for purposes of the

federal estate tax. The answer depends upon whether the mutual

will agreement was "contracted bona fide and for an adequate and

full consideration in money or money's worth," as required by 26

U.S.C. 2053(c)(1)(A).1 After careful review of the facts and

precedent, we affirm the Tax Court's determination that the claim

is not deductible.

 

 1 Section 2053 provides in relevant part:

 (a) General rule.--For purposes of the tax imposed
 
 by section 2001, the value of the taxable estate shall
 be determined by deducting from the value of the gross
 estate such amounts--
 * * *
 (3) for claims against the estate, . . . as are
 allowable by the laws of the jurisdiction . . . under
 which the estate is being administered.
 * * *
 (c) Limitations.--
 
 (1) Limitations applicable to subsections (a)
 
 and (b).--
 
 (A) Consideration for claims.--The deduction
 
 allowed by this section in the case of claims against
 the estate . . . shall, when founded on a promise or
 agreement, be limited to the extent that they were
 contracted bona fide and for an adequate and full
 consideration in money or money's worth . . . .

 -2-

 -3-

 I. Factual Background
 

 The decedent, Elizabeth Huntington, married Dana Huntington

on October 15, 1955. At that time, Dana's two sons from his

previous marriage, Charles and Myles, were, respectively, 30 and

28 years old. Elizabeth and Dana had one daughter, Nancy.

 On January 3, 1978, Dana executed a will in which he devised

to Nancy, Charles and Myles $25,000 each. The remainder of his

estate would be held in trust for the benefit of Elizabeth, and,

upon her death, the trust would terminate and the corpus would be

distributed in equal shares to the three children. This will was

revoked by Dana on May 8, 1979, when, during the illness that led

to his death, he executed a new will. The later will stated that

Dana intentionally was making no provision for Charles, Myles and

Nancy. Instead, Dana devised his entire estate to Elizabeth.

Dana died on April 6, 1980, and his May 8, 1979, will was

admitted to probate.

 Charles and Myles maintain that their father changed his

will in 1979 to give everything to Elizabeth only because she

agreed to execute a will devising her estate in three equal

shares to Nancy, Charles and Myles. They point to Dana's

previous will to demonstrate his intent to make direct bequests

to his sons, and they refer to conversations through the years in

which Dana acknowledged a moral obligation to leave part of his

estate to his sons in order to compensate for the inadequate

divorce settlement their mother received.

 -4-

 They also offer direct evidence of an agreement between the

couple. Dana's attorney, William Beckett, testified in his

deposition that, shortly before execution of the 1979 will, Dana

and Elizabeth discussed the arrangement in which Dana would leave

everything to her and she shortly would draft a will that would

include Charles and Myles. Also in a deposition, Myles's wife

testified that at the family luncheon immediately following

Dana's funeral, Elizabeth told her that "`Dana left everything to

me,' meaning herself, with the understanding that upon her death,

everything would be divided equally between the boys . . . and

Nancy . . . ." See App. at 133.
 

 Charles and Myles initially attempted to challenge the May

8, 1979 will based on their father's alleged mental incompetence.

They dropped that lawsuit,2 and on September 10, 1981, filed a

petition in Rockingham County (N.H.) Superior Court seeking to

impose a constructive trust on all of the property received by

Elizabeth from Dana's estate and on all of the property owned by

the decedent on and after May 8, 1979, the date of Dana's final

will. They alleged that Dana and decedent had made a binding

oral agreement to execute reciprocal wills, and that Elizabeth

had not yet executed a will in compliance with the agreement.

 On November 12, 1981, the superior court issued a temporary

restraining order barring Elizabeth from taking any actions to

encumber or transfer the property. Five years later, on December

 

 2 They abandoned this effort because of the difficulty of
proving that the will was the product of undue influence, see
 
Deposition of Myles Huntington, May 16, 1986, at 27. 

 -5-

10, 1986, Elizabeth, Charles and Myles settled the constructive

trust lawsuit. The settlement provided that Elizabeth would

execute a will in which she would devise 20 percent of her estate

to each of Dana's sons. Two weeks later, however, on December

24, 1986, Elizabeth died intestate. Charles and Myles filed a

notice of claim against her estate and, subsequently, they filed

a lawsuit to enforce the settlement terms.

 Charles, Myles, and their stepsister, Nancy -- as

administratrix of her mother's estate -- eventually settled the

lawsuit brought to enforce the terms of the earlier constructive

trust settlement. Under the second settlement, Nancy agreed to

pay to Charles and Myles a total of $425,000, an amount

representing 40 percent of Elizabeth's estate. Nancy made that

payment on April 14, 1989.

 On the federal tax return for Elizabeth's estate, a

deduction was taken for the settlement payment based on section

2053(a)(3) of the Internal Revenue Code, which allows deductions

for "claims against the estate."3 The Commissioner disallowed

the deduction, and calculated a deficiency of $117,067 in the

estate tax.4

 

 3 The estate return was filed before the settlement reached
among Charles, Myles and Nancy and the amount originally deducted
was $350,000. The estate later claimed a deduction for the full
amount of the $425,000 payment.

 4 Both the Tax Court opinion and the Commissioner's brief on
appeal state that the Commissioner rejected the deduction on the
ground that the payment was a testamentary disposition rather
than a claim against the estate within the meaning of section
2053(a). The Commissioner's Notice of Deficiency did not specify
the basis of the rejection. See App. at 73.
 

 -6-

 The Tax Court affirmed. It found that the asserted

reciprocal will agreement between Dana and Elizabeth lacked

adequate consideration to support a "claim[] against the estate"

within the meaning of section 2053. The court concluded that the

only consideration underlying the agreement was the couple's

"donative intent," making the agreement a testamentary

arrangement rather than an arms-length deal providing the basis

for a deduction. The court further held that the lawsuit filed

by Charles and Myles to enforce the alleged reciprocal will

agreement did not change the essence of the sons' claim so as to

render their claim deductible. 

 On appeal, the estate argues that Elizabeth received

substantial consideration in exchange for her promise to provide

for Charles and Myles in her will -- the excess amount over what

she would have received under Dana's revoked 1978 will -- and

that this consideration made the sons' claim fully enforceable

and deductible. In addition, the estate contends that Elizabeth

also received valuable consideration when she agreed in December

1986 to settle the constructive trust lawsuit. In exchange for

her promise to execute a will in which she would devise 40

percent of her estate to Charles and Myles, her stepsons released

their claim to two-thirds of her estate. The estate contends

that either or both of these considerations is sufficient to

support its claim to a deduction under section 2053.

 As there is no material dispute concerning the underlying

facts, our task is to determine solely whether the Tax Court

 -7-

properly applied the statute in these circumstances. Our review

therefore is de novo. See LeBlanc v. B.G.T. Corp., 992 F.2d 394,
 

396 (1st Cir. 1993). 

 II. 

 At the risk of stating the obvious, we think it worth noting

at the outset that any analysis of estate tax issues must be

sensitive to "the general polic[y] of taxing the transmission of

wealth at death," United States v. Stapf, 375 U.S. 118, 134
 

(1963). Section 2053 of the Internal Revenue Code, which allows

deductions from a decedent's gross estate for certain claims, has

been carefully crafted to promote that policy. In a series of

revisions to the statutory language early in the century,

increasingly formal requirements were imposed on claims based on

promises or agreements, see Taft v. Commissioner, 304 U.S. 351,
 

355-56 (1938);5 Estate of Pollard, 52 T.C. 741, 744 (1969), "to
 

 

 5 The history of section 2053 was detailed in Taft as
 
follows:

 The Revenue Act of 1916 permitted the deduction of the
 amount of claims against the estate "allowed by the
 laws of the jurisdiction . . . under which the estate
 is being administered." . . . The Act of 1924 altered
 existing law and authorized the deduction of claims
 against an estate only to the extent that they were
 "incurred or contracted bona fide and for a fair
 consideration in money or money's worth." Congress had
 reason to think that the phrase "fair consideration"
 would be held to comprehend an instance of a promise
 which was honest, reasonable, and free from suspicion
 whether or not the consideration for it was, strictly
 speaking, adequate. The words "adequate and full
 consideration" were substituted by 303(a)(1) of the
 Act of 1926.

304 U.S. at 356 (footnotes omitted).

 -8-

prevent deductions, under the guise of claims, of what were in

reality gifts or testamentary dispositions," Carney v. Benz, 90
 

F.2d 747, 749 (1st Cir. 1937).

 In other words, Congress wanted to be sure that bequests to

family members and other natural objects of the decedent's bounty

were not transformed into deductible claims through collaboration

and creative contracting. See Bank of New York v. United States,
 

526 F.2d 1012, 1016-17 (3d Cir. 1975); Carney, 90 F.2d at 749;
 

Estate of Satz v. Commissioner, 78 T.C. 1172, 1178 (1982);
 

Pollard, 52 T.C. at 744. Thus, a "claim against the estate" is
 

deductible only if the agreement giving rise to the claim was

"contracted bona fide and for an adequate and full consideration

in money or money's worth," 26 U.S.C. 2053(c)(1)(A).

 Thus far, this case has focused primarily on whether

Elizabeth Huntington received sufficient consideration, within

the meaning of section 2053, for her promise to include Charles

and Myles in her will. The Tax Court concluded that the

Huntingtons' reciprocal will agreement was supported only by

donative intent, and that this was not enough to establish a

deductible claim. In its notice of appeal and in its brief, the

estate specifically challenges the Tax Court's failure to credit

as consideration Elizabeth's enhanced inheritance -- the

immediate $75,000 representing the bequests previously earmarked

for Charles, Myles and Nancy, plus absolute rights in the balance

of Dana's estate (in contrast to simply a life estate).

Alternatively, it offers as "adequate and full" consideration the

 -9-

financial benefit conferred on Elizabeth when Charles and Myles

dropped the constructive trust lawsuit in exchange for her second

promise to include them in her will.

 Our view of the caselaw, reflected against the backdrop of

section 2053(c)(1)(A)'s limiting purpose, persuades us that the

real issue here is not whether Elizabeth received a financial

benefit from the reciprocal will agreement -- clearly, she did --

but whether the mutual promises made by Dana and Elizabeth

created the sort of "bona fide" contractual obligation for which

section 2053 allows a deduction. We have little difficulty in

concluding that they did not.

 Two threshold propositions inform our inquiry. First,

transactions among family members are subject to particular

scrutiny, even when they apparently are supported by monetary

consideration, because that is the context in which a testator is

most likely to be making a bequest rather than repaying a real

contractual obligation. See Bank of New York, 526 F.2d at 1016;
 

Estate of Morse v. Commissioner, 69 T.C. 408, 418 (1977), aff'd
 

per curiam, 625 F.2d 133 (1980); Estate of Woody, 36 T.C. 900,
 

903 (1961).6 Second, we need not be concerned with whether a tax

avoidance motive was present here, "because it is the substance

of the arrangement as a potential device for defeating the estate

tax that is of controlling significance," Estate of Pollard, 52
 

 

 6 We note, however, that a close relationship does not
necessarily preclude a deduction under section 2053. See infra
 
at 13-14. It simply requires close judicial review. Estate of
 
Morse, 69 T.C. at 418.
 

 -10-

T.C. at 745. See also Young v. United States, 559 F.2d 695, 703
 

(D.C. Cir. 1977).

 Thus, while the record in this case provides no evidence

that the Huntingtons sought to defeat estate taxes through their

reciprocal will agreement, this fact does not assist the estate's

effort to overturn the deficiency judgment. The record is

equally barren of evidence indicating that the agreement was

other than a collaborative effort to pass on the family's assets.

From all that appears in the record, it is most plausible that

Dana and Elizabeth discussed their respective desires for

disposing of their property, and concluded that everyone's needs

would be met by the simple will ultimately executed by Dana on

May 8, 1979, and the will Elizabeth was expected to complete

shortly thereafter. Such a purely voluntary, testamentary

arrangement is not the product of a bona fide contract, and

consequently does not provide a basis for a deduction under

section 2053.

 The estate suggests that, because Dana had a firm

commitment, evidenced by his prior wills,7 to make direct

bequests to his sons, the change in his last will must have been

the product of bona fide bargaining between the couple. Neither

the fact that Elizabeth received an immediate advantage, relative

to the earlier wills, nor Dana's longstanding intention to make

 

 7 The will in effect before 1978, which had been executed in
1971, provided for a bequest of one-half of his adjusted gross
estate to Elizabeth, and for the rest to pass to Myles and
Charles. 

 -11-

his sons beneficiaries of his estate is enough, however, to

transform an apparently cooperative agreement into a bona fide

contract. See Estate of Morse, 69 T.C. at 418.
 

 Dana simply may have changed his mind about the best way to

provide for his family, either before or after discussion with

Elizabeth. By passing on his entire estate to his wife, who was

substantially younger than himself, he could ensure that she

would be fully provided for as long as she lived. He may have

felt that Charles and Myles, both well into adulthood, had no

immediate need for the money. By securing his wife's agreement

that the balance of both of their estates would be divided

equally among the couple's three children, he still could fulfill

his moral obligation to Charles and Myles.

 There is no evidence that Dana and Elizabeth reached

agreement on the asserted reciprocal wills only after a period of

give-and-take bargaining. Indeed, Dana's sister testified that

her brother's lawyer suggested that "he not discuss every last

detail of his estate plan [with Elizabeth] because . . . she

would probably want to argue over every point." Elizabeth's

wishes may have played a substantial role in Dana's decision to

change his will -- she was, after all, his wife -- but the record

is silent as to any form of negotiations.8

 

 8 In its brief, the estate points to comments allegedly made
by Elizabeth and by Dana's sister, Marjorie, suggesting that Dana
became increasingly vulnerable to Elizabeth's "verbal onslaughts"
during his illness and that Elizabeth was aggressive on money
issues after Dana's death. This evidence does not, however,
reveal why and how Dana and Elizabeth decided to execute
reciprocal wills.

 -12-

 This is not to say that "hard bargaining as would occur

between hostile parties is [] an absolute prerequisite to a

deduction under section 2053," Estate of Morse, 69 T.C. at 419. 
 

But when family members adopt a course of action whose object is

to pass on their collective wealth, a deduction for the amount

ultimately transferred is not permitted under section 2053 unless

there is some showing of a bargained-for exchange. Any other

conclusion would seriously undermine the policy of taxing the

transfer of wealth at death. Where, as here, there is no

evidence of any type of negotiations, the claim to deductibility

unquestionably fails for lack of proof.

 The language of the Third Circuit in Bank of New York v.
 

United States, 526 F.2d at 1017, is equally applicable here:
 

 When the interests of family members are not
 divergent but coincide so that the elements of a
 transaction advance the separate concerns of each, we
 are unable to find the arm's length bargain mandated by
 the Code. This Court has adhered to the distinction
 between family arrangements bargained for at arm's
 length and family arrangements that reflect a community
 of interests. Tax advantages are not permitted when an
 agreement between members of a family could be regarded
 as a cooperative attempt to make a testamentary
 disposition rather than as an arm's length bargain.

 Indeed, on the issue of arm's-length bargaining, the case

before us is indistinguishable from Bank of New York, in which a
 

husband and wife executed reciprocal wills leaving their estates

first to each other and then to specifically identified friends

and relatives. The wife later made several changes in her will,

eliminating one of the husband's chosen beneficiaries and

limiting the bequest to the other. The wife's estate eventually

 -13-

settled with the two disadvantaged beneficiaries, and then sought

to deduct the settlement payment for estate tax purposes.

 The Third Circuit upheld the Commissioner's rejection of the

deduction, concluding that "the value of the claim settled by the

estate may not be deducted if the agreement on which the claim

was based was not bargained at arm's length." 526 F.2d at 1016.

The court found that no such bargaining took place there because

the parties were "of one mind" when they executed the mutual

wills for the purpose of fixing the ultimate disposition of their

property. Id. at 1017. "There is nothing in the record," the
 

court observed, "to support a finding that the mutual wills here

were executed as the result of an arm's length bargain of any

sort." Id.
 

 The court in Bank of New York carefully and appropriately
 

distinguished cases involving family arrangements in which

deductions were upheld, noting that they involved "the sort of

agreements that arise between parties separated by divergent

interests," id. at 1016-17. The clearest cases are those arising
 

in the divorce setting, where it is likely that the estranged

spouses obtain advantages only by trading them for concessions on

other issues. See, e.g., Leopold v. United States, 510 F.2d 617,
 

624 (9th Cir. 1975); Estate of Scholl v. Commissioner, 88 T.C.
 

1265, 1276 (1987).9

 

 9 Even in the divorce context, however, a claim will not
always be fully deductible. See In re Estate of Hartshorne, 402
 
F.2d 592, 596 (2d Cir. 1968) (deduction allowed for ex-wife's
life interest in property but denied for children's remainder
interest). 

 -14-

 In other instances, courts have upheld deductions when the

underlying transactions demonstrated that the claim at issue was

based on a "purely commercial undertaking," Carney, 90 F.2d at
 

749, or was "[i]n no sense . . . a device for making a

testamentary gift," Estate of Woody, 36 T.C. at 904. In Woody, a
 

deduction was allowed for a father's $14,000 bequest to his

daughter that was intended as reimbursement for the daughter's

earlier release of her brother -- at her father's request -- from

an indebtedness in that specific amount. In Carney, the claim
 

against the decedent's estate was based on a guaranty given by

the decedent on behalf of his wife and daughter in a regular

business context. 

 Some courts have suggested that a bona fide, deductible

claim can be differentiated from one that fails to meet the

requirements for deductibility by examining whether the claim is

against the estate or to a portion of the estate. See, e.g.,
 

Latty v. Commissioner, 62 F.2d 952, 953 (6th Cir. 1933); Estate
 

of Lazar v. Commissioner, 58 T.C. 543, 552 (1972). In other
 

words, if the debt underlying the claim has its origin in a

discretionary desire to pass on wealth to specific individuals --

giving those individuals a claim "to" a portion of the estate --

it is unlikely to be the sort of bona fide, arm's-length

obligation that is deductible under the statute. Deductible

claims will have arisen from transactions that created true debts

"against" the estate.

 -15-

 The estate, of course, insists that there was a debt here
 

once Elizabeth made her promise and received a financial benefit,

but then reneged on the deal. It may be that, under state law,

the reciprocal will agreement was an enforceable contract that,

when violated, created a debt in favor of Charles and Myles

against the estate. A valid contract is not necessarily enough,

however, to establish a deductible claim for purposes of section

2053. Bank of New York, 526 F.2d at 1015; see also Stapf, 375
 

U.S. at 131; Luce v. United States, 444 F. Supp. 347, 350 (W.D.
 

Mo., S.D. 1977); Carli v. Commissioner, 84 T.C. 649, 658 (1985);
 

Pollard, 52 T.C. at 744 ("To be sure, the mutual promises
 

undoubtedly constitute consideration under the law of contracts.

But the statute requires more."). A claim derived solely from

Dana Huntington's desire to share some portion of his estate with

his sons, carried out through cooperative estate planning, is

precisely the sort of "debt" section 2053(c)(1)(A) was designed

to exclude. See Bank of New York, 526 F.2d at 1018 ("The policy
 

of section 2053 is to deny a deduction where the underlying

transaction was `essentially donative in character.'") (citing H.

Rep. No. 2333, 77th Cong., 2d Sess. 169 (1942) (reprinted in

1942-2 Cum. Bull. 372, 493); S. Rep. No. 1631, 77th Cong., 2d

Sess. 238 (1942) (reprinted in 1942-2 Cum. Bull. 504, 679)).

 Nor does the subsequent court-approved settlement with

Elizabeth's estate transform the claim into an arm's-length

transaction within the meaning of section 2053. The Bank of New
 

York case again is directly on point:
 

 -16-

 To effectuate the policy underlying the federal
 estate tax requires that courts look beneath the
 surface of transactions to discover the essential
 character of each transfer. Even where a claim is
 ultimately satisfied by the operation of law, the
 courts will determine the nature of the claim for
 federal tax purposes by examining the particular status
 of the claimant that enabled him to impose his claim on
 the estate.

526 F.2d at 1017. See also Luce, 444 F. Supp. at 354; cf.
 

Phillips v. Gnichtel, 27 F.2d 662, 663-64 (3d Cir. 1928)
 

(involving transfers made "in contemplation of death," which are

included in gross estate except in case of "a bona fide sale for

a fair consideration in money or money's worth") ("[W]e [are]

inclined to go to the heart of the transaction and find, if we

can, just what the parties intended, just what they did and what

was the precise result.").

 Our examination of the issue of arm's-length bargaining

helps bring into focus the parties' dispute over consideration.

If the reciprocal will agreement did represent collaborative

estate planning by the Huntingtons, the fact that Elizabeth

received a larger direct bequest than she would have received

under Dana's prior will is of no consequence. In such

circumstances, the increase would reflect changed priorities

rather than a bargained- for "consideration." Cf. Estate of
 

Morse, 69 T.C. at 418 ("[A] consideration hypothetically full and
 

adequate within the statutory meaning has no relevance if the

asserted consideration was not part of the bargain between the

parties."); Estate of Morse, 625 F.2d at 135 ("[T]he Tax Court
 

was correct in ruling that it was necessary to show that such

 -17-

consideration was so bargained for . . . .").10 The problem

with the Huntington sons' claim therefore may be characterized

alternatively as a failure of proof of "full and adequate

consideration."

 We need not decide today whether there may be some factual

circumstances in which a claim that began with a wholly

discretionary desire to make a bequest can fulfill the

requirements of section 2053 for a "bona fide" contract supported

by "an adequate and full consideration in money or money's

worth." It suffices to say that, in this case, the requisite

attributes of a deductible claim were not shown.

 The decision of the Tax Court is affirmed.
 

 

 10 In Estate of Morse, decedent and his wife negotiated a
 
detailed antenuptial agreement to take care of various financial
concerns, including the wife's loss of income, upon her
remarriage, from a trust established by her former husband.
Decedent agreed that, after his death, his wife would receive
$12,000 per year during her life from his estate (the same amount
as provided by the forfeited trust).
 The Tax Court held that the commuted value of the wife's
right to receive the $12,000 was not deductible for estate tax
purposes as a claim against her husband's estate under section
2053. The court rejected the contention that the decedent's
right to live in his wife's house rent-free during his life, if
he had survived her, was consideration for his agreement to
provide her with the $12,000 income. 69 T.C. at 418 ("[A]n
examination of the facts and circumstances of this case reveals
an absence of bargaining . . . .").

 -18-