ESTATE OF JAMES HARRIS SCHOLL, JULIA SCHOLL ESDALE AND JOSEPH S. BAMBACUS, EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 18763-83.          Filed May 12, 1987.

*Harry L. Cohn*, for the petitioner.
*T. Keith Fogg*, for the respondent.

DRENNEN, *Judge*: Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $142,932.96.

After concessions[1] the issues presented by the parties for decision are: (1) Whether sections 2053(c)(1)(A)[2] and 2043(b) apply to limit petitioner's claimed deduction under section 2053(a)(3) for payments made to decedent's former wife for claims against his estate; and (2) whether decedent's gross estate includes, pursuant to section 2035, the full value of the Pamunkey River Farm purchased within 3 years of his death.

Some of the facts have been stipulated. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference.

### FINDINGS OF FACT

At the time of filing the petition in this case, both Julia Scholl Esdale ( Julia) and Joseph B. Bambacus (Bambacus), coexecutors of the Estate of James Harris Scholl (James), resided in the State of Virginia. The coexecutors of James' estate timely filed a Federal estate tax return, Form 706, with the Memphis Service Center.

James and Dove Allen Scholl (Dove) married on December 25, 1940. Two children were born to this marriage.

In 1950, James began selling encyclopedias and other educational material for World Book Encyclopedia (World Book). He set many sales records and enjoyed a "wonderful reputation nationwide" with the World Book organization. After a number of years of service, James became branch

---

[1]In his notice of deficiency, respondent made 12 separate adjustments to petitioner's Federal estate tax return. Before trial the parties settled and/or stipulated to all but two of these issues; both of which are addressed and decided herein. At trial on Nov. 19, 1985, petitioner sought to amend his pleadings to address a "new interest issue." With respondent's consent, petitioner was granted leave to file an amended petition. Respondent's consent was conditioned upon petitioner's providing respondent with information needed to support the new issue. On Nov. 21, 1985, petitioner's counsel met with respondent and provided some additional information, but it was insufficient to fully develop petitioner's case on the new issue. The Court gave petitioner until Dec. 2, 1985, to deliver to respondent the documentary information requested together with proposed stipulations. Neither respondent nor this Court received any communication from petitioner after Nov. 22, 1985, and, upon respondent's motion, the record was closed on Jan. 3, 1986. Petitioner argued this new issue in its brief filed Mar. 6, 1986. (Petitioner did not file a reply brief.) Since the issue was argued for the first time in petitioner's brief after the record was closed, justice requires that we do not consider this argument. Rule 34(b)(4),(5), and Rule 41.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

manager for the State of Virginia. As such, he was in charge of sales for World Book throughout the entire State, with the exception of a five-county area in Northern Virginia. He created and supervised an organization consisting of office staff, sales people, area managers, district managers, and division managers.

Julia began working for James in 1959. In 1969, she became the office manager and remained in that position until James' retirement. As office manager, Julia ran the administrative functions of the office and was considered very knowledgeable of all business aspects of James' operations.

On November 25, 1968, James divorced Dove. At this time, their two children were ages 15 and 19. The family lived in Henrico County, Virginia. As part of the divorce, James and Dove entered into a property settlement agreement (settlement agreement). Paragraph 4(c) of the settlement agreement provided as follows:

(c) In the event [James] predeceases [Dove], or in the event [James] is still living upon his retirement, then in lieu of the monetary provisions herein made for [Dove's] support and maintenance, [James] will set aside one-half of the amount due him from World Book's retirement profit sharing plan, said one-half not to exceed the sum of $200,000.00, and invest the same for the use and *benefit of Dove for the rest of her life* or until she remarries, *with all the income, only, to be payable to [Dove]*, and upon the death or remarriage of [Dove] the said income to be distributed between the children born of the marriage between [James] and [Dove] in such amounts as [James], in his uncontrolled judgment and discretion, may deem necessary or advisable, with the *principal to be divided and distributed equally between said children upon [James'] death*; and in the event [James] predeceases [Dove], he will, by his last will and testament, direct his executors and/or trustees to comply with the terms of this subparagraph. In the event [Dove] predeceases [James], *the said children shall be entitled to the full amount of the principal*, upon [James'] death, but [James'] estate shall not be liable to the said children for any undistributed income. [Emphasis added.]

In addition to the provisions concerning the World Book profit-sharing plan (profit-sharing plan), the settlement agreement provided that Dove was to receive (1) the Oldsmobile car she drove, free and clear; (2) all of the household furnishings located at 8855 River Road, Richmond, Virginia (River Road home); (3) $11,700 per year for Dove's support and maintenance; (4) all debts incurred by

Dove and/or James prior to the date of their divorce to be paid by James; (5) exclusive use of the River Road home for her life or until remarriage, with James paying mortgage, taxes, insurance, repairs and maintenance; (6) all of Dove's burial expenses to be paid by James unless James died or retired before Dove; and (7) all needs of the two minor children including, education, clothes, medical expenses, "spending money" and "other incidentals and necessities for support," except food, were to be paid by James. In return, Dove relinquished certain support and inheritance rights against James and/or his estate. Paragraphs 9, 10, and 11 of the settlement agreement provided as follows:

### 9. WAIVER OF PROPERTY RIGHTS

All property and money received by the respective parties pursuant hereto shall be the separate property of the respective parties, free and clear of any right, interest or claim of the other party, and each party shall have the right to deal with, and dispose of, his or her separate property as fully and effectively as if the parties had never been married, except that (Dove) shall have the exclusive right to reside, live in, and occupy the residence at 8855 River Road, Henrico County, Virginia, until her remarriage or until she dies, which ever shall first occur.

### 10. WAIVER OF SUPPORT RIGHTS

Except as is expressly provided in this Agreement, each party is fully released by the other from any obligation for alimony, support, and maintenance, attorney's fees and court costs, and each party accepts the provisions herein in full satisfaction of all property rights and all obligations for support or otherwise arising out of the marital relationship. Each party, except with respect to payments accruing pursuant to this agreement, hereby releases the other party, and his or her respective legal representatives, successors and assigns, from claims of every kind and specifically relinquishes all right, title and interest in or to any earnings, accumulations, money or property of the other party.

### 11. WAIVER OF RIGHTS TO ESTATE

Each of the parties waives all rights of inheritance in the estate of the other, and hereby relinquishes any and all rights of every kind and character whatsoever which such party has, or might hereafter have, by reason of the marriage, in and to the property of the other including rights of dower and curtesy, excepting only the rights created and expressly provided by this agreement.

If the local court in Henrico County, Virginia, were to have divided the couple's property in lieu of the settlement

agreement, Dove would have received approximately $23,500 per year in support payments and fee simple title to the River Road home.[3] Dove entered into the settlement agreement against the advice of Bambacus, then acting in the capacity of Dove's attorney. At the time she signed the settlement agreement, Dove was hopeful that she and James might reconcile their differences.

In 1968, possession of the River Road home was given exclusively to Dove for her use for life or until remarriage. The home's value in 1968 was $100,000.

Julia married James in 1969, becoming his second wife, and she remained his wife until his death.

James executed a will on December 29, 1970, and a codicil to his will was executed on November 20, 1978. Neither document mentioned the settlement agreement or James' obligation to establish a trust for the benefit of Dove.

On July 6, 1973, James had a heart attack. He retired from World Book in the fall of 1978. Despite the terms of the settlement agreement, no trust was established for the benefit of Dove upon his retirement. Between 1973 and 1978, James continued to work as branch manager for World Book, although reducing both his work load and work week. During this time of semi-disability, James relied more heavily on Julia to perform the day-to-day operations of his office.

On or about August 29, 1978, James and Julia purchased a farm in King William County, Virginia (Pamunkey River Farm) for $799,500. They took title to this farm as tenants in common. A $199,500 "downpayment" for the property was obtained by borrowing the same amount from the Production Credit Association (PCA). A note in favor of PCA (PCA note), was executed on August 16, 1978, by James and Julia wherein both were "jointly and severally" liable. The PCA note was secured by a trust deed on the Holly Hill

---

[3]This fact was established by uncontroverted testimony of David Meade White, a lawyer, former Circuit Court judge, and author of the Virginia Domestic Relations Handbook. Mr. White testified that a wife in Henrico County, in a hypothetical fact pattern similar to that in the instant case, would be awarded 25 to 45 percent of her husband's adjusted gross income and fee simple title to their personal residence. James' adjusted gross income for taxable year 1967, the year closest to the year of divorce for which James' tax returns were included in the record, was approximately $67,000. Accordingly, Dove would have received between $16,750 to $30,150 in annual support payments under a decree of divorce in Henrico County. As did the parties, we use the average of these figures, approximately $23,500, for purposes of our decision herein.

Farm (Holly Hill Farm), a farm purchased by James in 1962. The balance of the purchase price was represented by a "Deed of Trust Note" in the amount of $600,000 payable to Waring and Evelyn Edwards (Edwards note), presumably the sellers in the above transaction. James and Julia each executed the Edwards note as "makers."

James suffered a second massive heart attack on July 10, 1979, and died on July 12, 1979, of acute cardiac failure brought on by arteriosclerotic heart disease.

James' estate paid Dove the amount of $188,594, which amount represented one-half of James' World Book profit-sharing plan interest. Despite the terms of the settlement agreement, the money was not paid to a trust with Dove as the income beneficiary for life or until remarriage. On petitioner's Federal estate tax return, the estate claimed a deduction for the full amount paid to Dove. In addition, James' estate included only one-half the value of the Pamunkey River Farm on its Federal estate tax return.

## OPINION

### I. *Claims Against the Estate Founded on the Settlement Agreement*

Respondent contends that Dove's claims against James' estate are "founded on a promise or agreement" so that section 2053(c)(1)(A)[4] and section 2043(b)[5] apply to limit petitioner's section 2053(a)(3) deduction for such claim "to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth." Respondent argues the settlement agreement lacked adequate consideration because: (1) Petitioner failed to establish that the value, expressed in dollars, of the support

[4]Sec. 2053(c)(1)(A) provides in relevant part:

(c) LIMITATIONS.—

    (1) LIMITATIONS APPLICABLE TO SUBSECTIONS (a) AND (b).—

        (A) CONSIDERATION FOR CLAIMS —The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth; * * *

[5]Sec. 2043(b) provides:

SEC. 2043(b). MARITAL RIGHTS NOT TREATED AS CONSIDERATION.—For purposes of this chapter, a relinquishment or promised relinquishment of dower or curtesy, or of a statutory estate created in lieu of dower or curtesy, or of other marital rights in the decedent's property or estate, shall not be considered to any extent a consideration "in money or money's worth."

rights Dove relinquished is equal to or greater than the value of her income interest in the trust to be funded by one-half of James' interest in the World Book profit-sharing plan; and (2) that Dove's motive for entering into the settlement agreement negates any finding that the agreement was supported by adequate consideration. Petitioner admits that the limitations provided in sections 2053(c)(1)(A) and 2043(b) apply, but argues that the full amount of Dove's claim was supported by full and adequate consideration in money or money's worth so that the claimed deduction is allowable in full.

Respondent further argues that even if the claim is supported by consideration, because the estate was required to give Dove only a life interest in the trust, the dollar value of the trust is "a further limiting factor" on any deduction the estate may claim and that the estate was incorrect in deducting the full payment made to Dove. The Court must first decide whether Dove's claim was adequately supported by consideration and then determine the amount, if any, of the deduction under section 2053(a)(3).

### 1. Full and Adequate Consideration

#### A. Value of Forgone Support Rights Compared to Value of Property Rights Under the Settlement Agreement

In support of his first argument, lack of consideration, respondent relies on the "deferred support concept" as outlined in Rev. Rul. 71-67, 1971-1 C.B. 271. The ruling provides a method for determining the adequacy of consideration when support rights are exchanged for other property under a property settlement agreement. Stated simply, if the dollar value of the foregone support rights is equal to or greater than the dollar value of property received under a property settlement agreement, the obligation evidenced by the agreement is deemed to be supported by adequate consideration for purposes of sections 2043(b) and 2053(c)(1)(A). The analysis involves three major steps. First, the value of the foregone support rights is determined. Next, the value of the property received under the property settlement is computed, and finally the two are compared. Life estate annuity factors are included in the calculations

when, as in the instant case, foregone support rights and property settlement payments terminate upon the death of the recipient spouse.[6] This method was adopted by the Court in *Estate of Fenton v. Commissioner*, 70 T.C. 263 (1978).

### (i) *Value of Dove's Forgone Support Rights*

Respondent calculated the value of Dove's forgone support rights as follows:

| | |
|---|---:|
| (a) Annual support rights (as of date of separation agreement) | $25,000 |
| (b) Less: Contract payment | 20,700 |
| (c) Excess | 4,300 |
| (d) Multiply: Annuity factor for joint lives | 10.3754 |
| (e) Value of postponed support rights | 44,614.22 |

Petitioner also relies on Rev. Rul. 71-67, *supra*, but fails to apply the analysis set forth therein. Petitioner argues that Dove would have received $27,500[7] per year for 10 years, for a total of $275,000 as Dove's foregone support payments. Apparently, petitioner multiplied the annual support payment by 10, because 10 years lapsed between the date of the settlement agreement and James' death. No support for this analysis is given. To the $275,000 cumulative support payments, petitioner adds the value of the River Road home, valued in 1968 at $100,000, which Dove would have received under a decree of divorce. Petitioner concludes the total value of Dove's foregone support rights is $375,000.

Petitioner's "analysis" completely ignores the formula established in Rev. Rul. 71-67, as adopted by *Fenton*, and is of very little use. We find that respondent's calculations, with some modification, more closely resemble the true value of Dove's foregone support rights. We have concluded as a finding of fact that Dove's annual support rights as of

---

[6]Remarriage annuity factors may also apply to the calculations when, as in the instant case, support rights and property settlement payments terminate upon the remarriage of the recipient spouse. Respondent stated, "the value of (Dove's) life estate * * * is not further reduced by a remarriage factor. It is not thought that the remarriage factor would be large." Dove was age 56 at the time of the divorce. Petitioner has not challenged respondent's conclusion.

[7]No explanation is given as to how petitioner arrived at the $27,500 figure for Dove's annual support payments. We have concluded as a finding of fact that the correct figure is $23,500.

the date of the separation agreement under a local divorce decree would have been about $23,500. We use this figure in lieu of the $25,000 figure used by respondent at line (a) of his calculation. Furthermore, we believe respondent erred in subtracting a contract payment of $20,700 at line (b) of the calculation. Respondent derived this figure by adding $9,000, which respondent argues represents the value to Dove for use of the River Road home, to the $11,700 annual payment Dove received pursuant to the settlement agreement. Neither party has introduced any evidence as to the fair market rental value of the River Road home during the years in issue. Accordingly, we have no evidence upon which to base a finding in this matter. Furthermore, Dove was entitled to title to the home in addition to support payments. So we have excluded the home from our calculations. We find that respondent has used the correct annuity factor listed in line (d) of the calculation as 10.3754.[8] We find the dollar value of Dove's foregone support rights was $122,429.72, calculated as follows:

| | |
|---|---|
| (a) Annual support rights (as of date of separation agreement) | $23,500 |
| (b) Less: Contract payment | 11,700 |
| (c) Excess | 11,800 |
| (d) Multiply: Annuity factor for joint lives | 10.3754 |
| (e) Value of postponed support rights | 122,429.72 |

(ii) *Value of Dove's Property Rights Under the Settlement Agreement*

Next we must determine the value of the property Dove received under the settlement agreement in lieu of her support rights. Under the settlement agreement, the value of one-half of James' interest in the World Book profit-sharing plan, valued at the earlier of James' retirement or his death, was to be placed in a trust, with income therefrom to be paid to Dove for the remainder of her life or until she remarried.

---

[8]The factors necessary to compute the annuity factor for joint lives are based on U.S. Life Tables 38, example 15. See T. Grevielle, United States Life Tables and Actuarial Tables 1939-41, U.S. Department of Commerce, Bureau of the Census (1946). Respondent correctly used the date of the settlement agreement (1968) as the date of valuation for determining the annuity factor for joint lives. Respondent correctly used Dove's age at the date of the settlement agreement, 56, and James' age, 53 at the date of the settlement agreement, for purposes of this calculation.

For some unexplained reason, James did not establish the trust upon his retirement; nor did his estate establish the trust upon James' death. Neither is it explained why, upon James' death, the estate chose to distribute to Dove $188,594, which amount would have been the *principal* of the trust, instead of the value of an *income life estate*. We find the distribution to Dove particularly curious when the settlement agreement clearly stated that trust "income, only" was to be distributed to Dove, that the "principal [was] to be divided and distributed equally between [James' children] upon [his] death," and that "said children shall be entitled to the full amount of the principal." In paragraph 11 of the settlement agreement, Dove waived "any and all rights of every kind and character * * * excepting only the rights created and expressly provided by this agreement." The record contains no theory by which Dove's claim could be expanded beyond an income interest for life or until remarriage.

Petitioner argues the $188,594 distributed to Dove represents the value of what Dove received under the settlement agreement and this figure must be compared to the value of Dove's forgone support rights when determining whether the estate's obligation to pay Dove was supported by full and adequate consideration. Respondent argues that because the estate was required to give Dove only a life interest in the trust, the dollar value of the life interest is "a further limiting factor on any deduction the estate may claim, and the estate was incorrect in deducting the full payment made to her."

To resolve the dispute, we must determine the value of Dove's trust interest. If this amount is less than $188,594, the amount actually distributed to Dove, we must decide whether the excess so distributed should be included under section 2043(b) in determining whether a relinquishment of marital rights is supported by "consideration in money or money's worth."

The determination of the value of Dove's life interest in the trust income necessitates certain actuarial calculations. Respondent submitted what he considered to be the actuarial value of Dove's life estate. Petitioner did not address this point. Respondent calculates this value by multiplying

$192,500, which amount respondent incorrectly lists as one-half of James' interest in the profit sharing plan, and multiplied this figure by a life estate factor of .52583 to produce the resulting life estate value of $101,222.75. In general, we accept respondent's formula and find it within the principles established in *Fenton*. However, we find it misapplied in the instant case. The parties stipulated that the value of one-half of James' interest in the profit-sharing plan was $188,954, not the $192,500 amount used by respondent. Furthermore, the life estate factor applied by respondent was determined by valuing the life estate at James' death rather than the date of the settlement agreement. We previously considered and rejected respondent's position on this issue in *Estate of Fenton v. Commissioner, supra* at 274-275, stating:

> The crux of respondent's argument is, "Since the life estate was not to be set up until [the taxpayer's] death it had no ascertainable value at the time the separation agreement was executed."
>
> We find such argument fanciful and reject it. A wife who is bargaining away her right to support is engaged in hard and serious negotiations and can be expected to know the worth of what she is getting in return.
>
> Section 2053(c)(1)(A) limits a deduction for claims against the estate, when founded on a promise or agreement, to the extent that they were contracted bona fide for an adequate and full consideration. Therefore, the date on which the contract agreement was made is the proper date on which [the wife's] claims against [the decedent's] estate must be valued and compared with the value of her postponed support rights to determine if she gave adequate and full consideration for her claims against [the decedent's] estate * * * [Fn. refs. omitted.]

Valuing Dove's life estate as of the date of the settlement agreement, when Dove was 56 years old and James was 53 years old, we find that the life estate factor to be applied to test for adequate consideration in this case is .44688.[9] The correct value of Dove's life estate in the trust, computed for purposes of determining consideration, is as follows:

| | |
|---|---:|
| (a) One-half interest in profit-sharing plan | $188,594 |
| (b) Multiplied by life estate factor | .44688 |
| (c) Value of Dove's life estate | 84,278.89 |

[9]The life estate factor is determined from Table I for a 56-year-old individual at 3½ percent, showing a present worth of a life interest in property for decedents dying before Jan. 1, 1971. This table may be found in sec. 20.2031-7(f), Estate Tax Regs. Actuarial tables used to value interests in property of decedents dying before Jan. 1, 1971, did not delineate between male and female individuals.

For purposes of testing consideration under section 2053(c)(1)(A) and section 2043(b), the value of Dove's rights in the trust are limited to $84,278.89, which amount represents the dollar value of the legal obligation of the estate determined at the time of the settlement agreement.[10] Payments made by James' estate in excess of this amount are not included in determining whether a relinquishment of support rights is supported by "consideration in money or money's worth."

### (iii) *Full and Adequate Consideration*

Having determined the value of Dove's forgone support rights, $122,429.72, and the value of Dove's rights under the settlement agreement for purposes of testing consideration, $84,278.89, we can now test for adequate consideration under section 2053(c)(1)(A). Because Dove relinquished property rights valued at more than the property rights she received under the settlement agreement, Dove's claim against James' estate founded on the settlement agreement is supported by full and adequate consideration within the meaning of section 2053(c)(1)(A) and section 2043(b).[11]

### B. *Adequate Consideration and Motive*

Respondent's second argument, that Dove's motive for entering into the settlement agreement negates a finding of adequate consideration, is meritless. No authority is cited, and we can find none, stating that motive is relevant to the determination of consideration under section 2053. Even if relevant, Dove's hope that she and James would reconcile their differences in no way casts doubt that she bargained for and gave adequate consideration for the exchange of rights under the settlement agreement.

---

[10]The value of Dove's life estate differs in the instant case, when measured for purposes of determining consideration and when determining the allowable deduction under sec. 2053(a). This distinction is more fully explained at the paragraph of this opinion, entitled "Amount of Section 2053(a)(3) Deduction."

[11]While we have gone through the mechanics of trying to determine, as of the date of the agreement, the uncertain value of what Dove gave up and received under the agreement, because the parties have done so, we think that as a practical matter a State court would conclude that in this negotiated settlement, Dove gave adequate and full consideration, which would support her claim to receive what she was entitled to receive under the agreement.

## 2. *Amount of Section 2053(a)(3) Deduction*

Having concluded that Dove's claim against the estate was supported by adequate consideration, we must next determine the amount of the deduction allowable as an obligation of the estate under section 2053(a)(3).

The inquiry once again requires us to determine the value of Dove's life interest in the income produced from the trust. We stated in *Fenton* that the value of the estate obligation is to be determined as of the *date of the settlement agreement* when testing for adequate consideration under sections 2043(b) and 2053(c)(1)(A). We conclude here that once adequate consideration is established, the value of the estate's deduction based on the obligation must be determined at the *date of death*, or the alternate valuation date if elected by the estate.[12] Support for this interpretation is found in the legislative history of section 2053(c)(1)(A).

Most of the statutory language now contained in section 2053 can be traced back to section 203(a)(1) of the Internal Revenue Act of 1916; however, that section did not limit deductions for claims against the decedent's estate only to the extent they were supported by full and adequate consideration. The consideration limitation was first introduced in section 303(a)(1) of the Internal Revenue Act of 1924,[13] and has since been included in all revisions and recodifications of that section. Congressional intent in adding the provision is found in the Statement of the changes made in the Revenue Act of 1921 by H.R. 6715 (Internal Revenue Act of 1924), and the reasons therefor

---

[12]In *Estate of Fenton v. Commissioner*, 70 T.C. 263 (1978), we allowed a deduction of $184,550.29 under sec. 2053(a)(3) when consideration in support of the obligation was valued at $34,518.41. We concluded in that case that the value of the marital rights relinquished by the surviving spouse at least equaled the value of the rights she received under the property settlement agreement valued at the date of execution. However, in *Fenton* the decedent's estate did not claim a deduction for payment to an estate creditor in excess of the estate's binding legal obligation. Therefore, we did not consider in that case whether a different valuation date was required to establish the amount of the payment allowable as a sec. 2053(a)(3) deduction.

[13]Sec. 303(a)(1) of the Internal Revenue Act of 1924, 43 Stat. 306, reads in relevant part as follows:

(1) Such amounts for funeral expenses, administration expenses, claims against the estate, unpaid mortgages upon, or any indebtedness in respect to, property * * *, to the extent that such claims, mortgages, or indebtedness were incurred or contracted bona fide and for a fair consideration in money or money's worth * * *

prepared by the Senate Finance Committee. The explanation reads as follows:

Section 303: In paragraph (1) a clause has been inserted authorizing the deduction of claims, mortgages, and indebtedness of the estate only to the extent that such claims, mortgages, and indebtedness have been incurred or contracted for a fair consideration.

Section 402(c) of the existing law contains a limitation similar in character in the case of transfers and trusts whereby property interests transferred by the decedent in contemplation of or intended to take effect after his death are included in his gross estate, unless such interests were transferred by a bona fide sale for a fair consideration. On principle the same limitation should be applied here, and the proposed amendment is designed to effect this result. [S. Rept. 398, 68th Cong. 1st Sess. 29 (1924), 1939-1 C.B. (Part 2) 290.]

Section 402(c) referred to in the committee report is the predecessor of current section 2035. Congress inserted the consideration limitation now contained in section 2053(c)(1)(A) for the same reasons it did so in section 2035. Thus, the determination date for purposes of consideration and deduction under section 2035 provides a basis for the same determination dates under section 2053(c)(1)(A). Although adequacy of consideration under section 2035 is determined as of the date of transfer, the amount of the deduction allowable under section 2035 is determined as of the date of death. Section 20.2035-1(e), Estate Tax Regs., reads in relevant part as follows:

(e) *Valuation.* The value of an interest in transferred property includible in a decedent's gross estate under this section is the value of the interest as of the applicable valuation date. * * *

The "applicable valuation date" referred to in section 20.2035-1(e), Estate Tax Regs., is the date of death, or the alternate valuation date, if elected by the estate. The same determination dates apply under section 2053(a)(3). Although consideration, under section 2053(c)(1)(A), is tested at the date the obligation against the estate was negotiated, the settlement agreement in the instant case, the amount of the deduction allowable for an obligation adequately supported by consideration is determined as of the date of death.

Dove's life estate in the trust income, valued at the date of James' death,[14] is calculated as follows:

(a) One-half interest in profit-sharing plan .............. $188,594
(b) Multiplied by life estate factor[1] ..................... .54211
(c) Value of Dove's life estate.......................... [2]102,238

[1]The life estate factor is determined from Table A(2) for a 66-year-old female at 6-percent interest, showing a present worth of a life interest in property for decedents dying after Dec. 31, 1970.

[2]Ordinarily, the value of the life estate in trust income would decrease when valued, as in the instant case, 10 years later than the first valuation. Instead, the valuation increases due primarily to changes in the actuarial tables applied to estates of decedents dying before Jan. 1, 1971, and those dying after. For example, actuarial tables applicable to pre-1971 estates did not delineate between male and female lives and were based on an assumed interest rate of 3½ percent. Those applicable to post-1970 estates were based on a 6-percent interest rate and contained figures for both male and female lives.

Next, we must decide if section 2053(c)(1)(A) entitles an estate to deduct in full a payment to an estate creditor in excess of that creditor's claim against the estate.

Section 2053(c)(1)(A) states that a deduction for claims against the estate shall, "when founded upon a promise or agreement, *be limited to the extent that they were contracted bona fide* and for an adequate and full consideration in money or money's worth." (Emphasis added.) The section lists two related, but separate requirements—namely, that the claim against the estate be "contracted bona fide" *and* that the claim must be supported by "adequate and full consideration." If either requirement is missing, the deduction fails under section 2053(c)(1)(A). This conclusion is supported by section 20.2053-4, Estate Tax Regs., which reads in relevant part as follows:

Deduction for claims against the estate; in general. *The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death. * * * Only claims enforceable against the decedent's estate may be deducted. * * * section 2053(c)(1)(A) provides that the allowance of a deduction for a claim founded upon a promise or agreement is limited to the extent that the liability was contracted bona fide and for an adequate and full consideration in money or money's worth. * * ** [Emphasis added.]

[14]James' estate did not elect the alternate valuation date under sec. 2032.

We find, due to lack of evidence to the contrary, that Dove's claim against James' estate was limited to a life estate in the income of the trust. Under the settlement agreement, Dove was not entitled to any of the trust principal. Even though the entire payment to Dove was supported by full and adequate consideration, the estate may deduct only that amount which represents a binding legal obligation against the estate. See *Propstra v. United States*, 680 F.2d 1248 (9th Cir. 1982). We cannot permit executors of James' estate to increase the deduction by their own voluntary action as to the choice of payment of James' debts. Cf. *Sherman v. United States*, 492 F.2d 1045 (5th Cir. 1974). Accordingly, we hold James' estate is entitled to deduct $102,238.69, the value of Dove's life estate in the trust. The remaining $86,355.31 is, without evidence to the contrary, deemed to be a voluntary payment by the estate and is not deductible under section 2053(a)(3).[15]

## II. *Transfer Within 3 Years of Death*

In his notice of deficiency, respondent determined that a "transfer of one-half interest" in the Pamunkey River Farm was made by James to Julia within 3 years of his death. Respondent proposes to include the full value of the farm as an asset of the estate. Respondent recites the general rule of section 2035(a)[16] that, "the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, during the 3-year period ending on the date of the decedent's death." Respondent then recites the exception contained in section 2035(b)(1)[17] and states "if the estate can show that this transfer was for

---

[15]We do not express an opinion whether the excess amount is deductible under some other section.

[16]Sec. 2035(a) provides:

SEC. 2035(a). INCLUSION OF GIFTS MADE BY DECEDENT.—Except as provided in subsection (b), the value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise during the 3-year period ending on the date of the decedent's death.

[17]Sec. 2035(b)(1) provides:

SEC. 2035(b). EXCEPTIONS—Subsection (a) shall not apply—

(1) to any bona fide sale for an adequate and full consideration in money or money's worth
* * *

adequate consideration in money or money's worth, then the exclusion of one-half of the value of the farm was proper." The gravamen of respondent's argument is that James made a gift to Julia upon the purchase of the Pamunkey River Farm in 1978. Respondent argues that by taking title as tenants in common, a gift to Julia occurred. Petitioners argue that in fact, no gift occurred, or in the alternative, that adequate consideration passed from Julia to James for whatever she received.

We cannot believe that section 2035 is properly applied to the acquisition of the Pamunkey River Farm. It is clear that section 2035 requires that a transfer, usually in the form of a gift, be made by the decedent during the 3-year period ending on the date of decedent's death. Respondent would have us believe that such a transfer or gift occurred when title to the Pamunkey River Farm was taken by James and Julia as tenants in common. For the reasons set forth below, we disagree.

The Pamunkey River Farm was purchased by James and Julia for a total purchase price of $799,500. The purchase price was satisfied when James and Julia made an initial cash payment of $199,500 and signed a note back to the sellers, the Edwards note, in the amount of $600,000. The $199,500 downpayment came from a loan from PCA and was evidenced by the PCA note secured by a second deed of trust on the Holly Hill Farm. James and Julia were jointly and severally liable on this note. Respondent correctly states that James acquired the Holly Hill Farm prior to his marriage to Julia and that Julia shared no interest in this property which secured the loan from PCA. Respondent argues that the encumbrance of James' separate property constituted a gift to Julia. No authority is cited for this proposition, and we find it unpersuasive in view of the fact that Julia was jointly and severally liable on the PCA note. In the event of default on the note, PCA would have a claim against Julia's separate assets, as well as those of James. Absent evidence to the contrary, we must conclude that assets owned separately by Julia, as well as those in which she held a joint interest with James, were at risk under the PCA note, and no transfer or gift may be implied by the pledging of this asset. Similarly, James and Julia each

signed as "makers" on the Edwards note for the balance of the purchase price, and both assumed liability for repayment of the borrowed funds. Having concluded that no transfer or gift occurred to Julia upon the acquisition of the Pamunkey River Farm, we find that no transfer took place within the meaning of section 2035. Petitioner properly included one-half the value of the Pamunkey River Farm on its Federal estate tax return.

*The decision will be entered under Rule 155.*