T.C. Memo. 2005-296


UNITED STATES TAX COURT


ESTATE OF WINIFRED HUGHES, DECEASED, DEAN McBRIDE, EXECUTOR AND
TRUSTEE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 21395-03.          Filed December 27, 2005.


David S. Grossman, for petitioner.

Julie L. Payne, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, Judge:  Respondent determined a deficiency of

$175,801 in the estate's estate tax.

Decedent's husband, George Robert Hughes (Bob Hughes),

founded Bob Hughes Motors, Inc., d.b.a. Advance Leasing (Advance

Leasing).  Bob Hughes died in 1996.  Winifred Hughes (decedent)

was the sole owner of the stock of Advance Leasing from 1996 until she died in 1999. After Bob Hughes died, Dean McBride (McBride) became the sole officer and director of Advance Leasing. Decedent issued a durable power of attorney to McBride in 1996.

In 1997, McBride executed an agreement and a promissory note on behalf of decedent and Advance Leasing which stated that decedent promised to pay $400,000 to Advance Leasing on demand in exchange for 4,000 shares of Advance Leasing's common stock. Advance Leasing issued a stock certificate to decedent for the 4,000 shares. McBride paid the $400,000 to Advance Leasing after decedent died in 1999.

The issues for decision are:

1. Whether $400,000 is deductible under section 2053(a)(3)[1] as a claim against decedent's gross estate based on the $400,000 promissory note. We hold that it is not.

2. Whether interest of $21,782 owed to decedent by Advance Leasing on certain promissory notes when decedent died is included in decedent's gross estate. We hold that it is not.

---

[1] Section references are to the Internal Revenue Code as in effect as of the date of decedent's death, unless stated otherwise. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.   Dean McBride

McBride, the executor of decedent's estate, resided in Phoenix, Arizona, when the petition was filed.  McBride was a longtime friend of Bob Hughes and decedent.  Bob Hughes died on April 10, 1996.  McBride was the executor of his estate.  McBride became trustee or manager of the family trust and other entities (discussed more fully below) that Bob Hughes and decedent established to hold almost all of their property.

B.   Decedent and Bob Hughes

Decedent and Bob Hughes were married around 1950 and lived near Seattle, Washington for most of their lives.  They had two children during their marriage:  Mark Hughes and Billy Hughes. Decedent had another son, and Bob Hughes had two children from prior marriages.  Decedent and Bob Hughes had 13 grandchildren. Bob Hughes owned automobile dealerships for many years in Burien, Washington, approximately 20 miles south of Seattle.

On April 27, 1972, Bob Hughes and decedent established the George R. Hughes Family Trust (GRH Trust) and other entities to hold almost all of their property.  Bob Hughes was the trustee or manager of GRH Trust and other entities that he and decedent had established.  After Bob Hughes died on April 10, 1996, decedent was the sole current beneficiary of GRH Trust, the children and

grandchildren of Bob Hughes and decedent and certain charities were future beneficiaries. McBride became the trustee or manager of GRH Trust and the other entities that Bob Hughes and decedent had established.

Decedent issued a durable power of attorney to McBride on August 20, 1996. At that time decedent was lucid and knew what assets she owned and who her family members were. Decedent moved to an assisted living facility in Peoria, Arizona, on May 19, 1998. She was soon diagnosed with Alzheimer's disease. She lived there until she died on July 25, 1999.

## C. Advance Leasing

### 1. Organization and Operation

Bob Hughes founded Advance Leasing around 1971. He and decedent originally owned all of the stock in Advance Leasing. They transferred their stock to GRH Trust when they formed it in 1972. Advance Leasing's office was in Burien, Washington. Advance Leasing sold used cars from 1971 through April 10, 1996. It began buying cars to lease to third parties some time after 1971 but before April 10, 1996.

Billy Hughes and Jeff Ross were independent contractors and salespersons for Advance Leasing. They earned commissions from selling and leasing cars. Bob Hughes hoped that Billy Hughes would eventually own a car dealership. Billy Hughes was a very good salesman but had alcohol and drug problems.

Advance Leasing financed its purchases of cars with loans it obtained from other entities established by Bob Hughes and decedent. At the end of 1994, 1995, and 1996, Advance Leasing owed $755,640, $861,069, and $964,257, respectively, to Bob Hughes and the other entities.

When Bob Hughes died, decedent became the sole beneficial owner of the stock of Advance Leasing, all of which was held by GRH Trust. Decedent was never involved in the business of Advance Leasing.

The Estate of Bob Hughes reported on the Federal estate tax return that was filed on July 9, 1997, that the stock of Advance Leasing had a fair market value of zero as of April 10, 1996, and that its liabilities exceeded assets. McBride signed that return as executor for the Estate of Bob Hughes.

2.   Advance Leasing's Financial Statements for 1994-99

Advance Leasing had the following amounts of gross sales, cost of goods sold, operating income, expenses, and net loss for 1994-99:

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
|---|---|---|---|---|---|---|
| **Gross sales--** | | | | | | |
| Used car retail sales | $94,553 | $129,188 | $64,350 | $115,868 | $68,416 | $9,066 |
| Used car wholesale sales | 1,100,376 | 999,448 | 1,318,741 | 1,846,700 | 1,100,987 | 107,153 |
| | 1,194,929 | 1,128,636 | 1,383,091 | 1,962,568 | 1,169,403 | 116,219 |
| **Cost of goods sold--** | | | | | | |
| Used car retail sales | $91,873 | $117,059 | $66,400 | $108,628 | $64,449 | $17,305 |
| Used car wholesale sales | 1,008,774 | 883,066 | 1,208,813 | 1,649,438 | 997,423 | 108,348 |
| Reconditioning costs | 2,897 | -- | -- | -- | -- | -- |
| | 1,103,544 | 1,000,125 | 1,275,213 | 1,758,066 | 1,061,872 | 125,653 |
| **Total operating income--** | | | | | | |
| Combined used car retail and wholesale sales income/(sales loss) | $91,385 | $128,511 | $107,878 | $204,502 | $107,531 | ($9,434) |
| Car lease income | 43,699 | 40,122 | 40,747 | 34,553 | 27,099 | 15,447 |
| Capital gain income/ (Capital loss) | 24,492 | 5,391 | 19,949 | 288 | 39,734 | (647) |
| Dividend income | -- | 290 | -- | -- | 4 | -- |
| Interest income | 13,380 | 12,229 | 19,675 | 34,180 | 33,732 | 1,051 |
| Miscellaneous income | 550 | -- | -- | -- | -- | -- |
| Other income | -- | -- | 74 | -- | 550 | 267 |
| Other rental income | -- | 6,700 | 6,050 | 6,050 | 4,950 | -- |
| | 173,506 | 193,243 | 194,373 | 279,573 | 213,600 | 6,684 |
| Total expenses | $240,178 | $244,238 | $234,899 | $300,448 | $214,846 | $125,717 |
| Net profit/(net loss) | ($66,672) | ($50,995) | ($40,526) | ($20,875) | ($1,246) | ($119,033) |

Advance Leasing had the following amounts of assets,[2]

liabilities, capital, and net worth[3] for 1994-99:

| Year Ended Dec. 31 | Assets | Liabilities | Capital | Net Worth |
|---|---|---|---|---|
| 1994 | $447,310 | $756,819 | ($309,508) | ($309,508) |
| 1995 | 581,322 | 941,825 | (360,503) | (360,503) |
| 1996 | 633,931 | 1,035,165 | (401,234) | (401,234) |
| 1997 | 772,194 | 1,194,304 | (422,110) | (422,110) |
| 1998 | 750,526 | 1,173,882 | (423,356) | (423,356) |
| 1999 | 657,782 | 800,170 | (142,388) | (142,388) |

---

[2] As discussed in par. E, below, Advance Leasing's financial statements for 1997 and 1998 did not refer to the 4,000 shares of Advance Leasing stock issued to decedent or decedent's $400,000 promissory note.

[3] Net worth equals assets minus liabilities and capital (if any).

Advance Leasing owed the following to Bob Hughes, George R. Hughes Enterprise Limited Partnership (HELP),[4] H & R Properties,[5] and the Trust:

| Creditor | Year ended Dec. 31 | | | | | |
|---|---|---|---|---|---|---|
|  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 |
| Bob Hughes- |  |  |  |  |  |  |
| Note payable | -- | $10,000 | -- | -- | -- | -- |
| Accrued int. | -- | 350 | -- | -- | -- | -- |
| Total | -- | 10,350 | -- | -- | -- | -- |
| H & R Props.- |  |  |  |  |  |  |
| Note payable | $755,640 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Accrued int. | -- | 4,754 | -- | 5,480 | 10,960 | 16,440 |
| Total | 755,640 | 104,754 | 100,000 | 105,480 | 110,960 | $116,440 |
| HELP- |  |  |  |  |  |  |
| Note payable | -- | $707,640 | $782,640 | $832,640 | $782,640 | $382,640 |
| Accrued int. | -- | 38,325 | 81,617 | 126,676 | 170,735 | 208,628 |
| Total | -- | 745,965 | 864,257 | 959,316 | 953,375 | 591,268 |
| Trust- |  |  |  |  |  |  |
| Note payable | -- | -- | -- | -- | $50,000 | $50,000 |
| Accrued int. | -- | -- | -- | -- | 5,000 | 9,500 |
| Total | -- | -- | -- | -- | 55,000 | 59,500 |
| Grand total | $755,640 | $861,069 | $964,257 | $1,064,796 | $1,119,335 | $767,208 |

Advance Leasing reported $29,663 of taxable income before net operating loss deductions on its 1997 income tax return.

D.   HELP

GRH Trust was a general partner of HELP.  Children and grandchildren of decedent and her husband were the limited partners.  GRH Trust, as general partner, held a .581-percent interest in HELP, and the children and grandchildren (the limited

_____

[4]  George R. Hughes Enterprise Limited Partnership is described in par. D, below.

[5]  H & R Properties was a Schedule C business owned by Bob Hughes and decedent.

partners) held a 99.419-percent interest. Advance Leasing borrowed money from HELP, and owed HELP $953,375 by the end of 1998.

E.  The Stock Subscription Agreement and the $400,000 Promissory Note

McBride knew it was important to decedent that Billy Hughes always have a place to work. On April 29, 1997: (1) McBride, acting under a power of attorney from decedent and as president of Advance Leasing, signed a stock subscription agreement under which decedent agreed to pay Advance Leasing $400,000 on demand and Advance Leasing agreed to issue to decedent an additional 4,000 shares of Advance Leasing's common stock; and (2) Advance Leasing issued a stock certificate to decedent for the 4,000 shares. The terms of the stock subscription agreement were not negotiated, and Advance Leasing's business was not appraised. The promissory note was not paid while decedent was alive.

Neither the $400,000 promissory note nor the 4,000 shares were identified on Advance Leasing's 1997 and 1998 financial statements or on its 1997 and 1998 corporate income tax returns. Neither Advance Leasing's bookkeeper nor its certified public accountant, whose accounting firm had prepared Advance Leasing's tax returns and reviewed its financial statements since the early 1990s, knew about the stock subscription agreement or the $400,000 promissory note.

F.    Events Following Decedent's Death

Decedent died on July 25, 1999.  McBride, as trustee of GRH Trust, transferred $400,000 to Advance Leasing on September 20, 1999.  Advance Leasing had not previously demanded payment of the promissory note.  During 1999, Advance Leasing used the $400,000 it received for the promissory note to repay $400,000 to HELP.

In 1998, Billy Hughes's wife filed for divorce, his substance abuse problems worsened, and he stopped working for Advance Leasing.  He entered a rehabilitation center for treatment late in 1998.  Advance Leasing ceased operating around 2000.

G.    Decedent's Estate Tax Return

Decedent's estate reported on the estate tax return that her gross estate included $150,000 of principal Advance Leasing owed on its notes to H & R Properties and GRH Trust, entities owned by decedent, but did not include $21,782 of interest Advance Leasing owed on those notes as of July 25, 1999, decedent's date of death.  Also on that return, decedent's estate deducted $400,000 as a claim against the estate based on the $400,000 promissory note.

Decedent's estate reported on that return that the stock of Advance Leasing had no value on decedent's date of death because liabilities exceeded the fair market value of assets.  McBride signed the return for decedent's estate.

OPINION

A. Whether $400,000 Is Deductible Under Section 6653(a)(1) as a Claim Against Decedent's Gross Estate Based on the $400,000 Promissory Note

1. Deductibility of Claims Against an Estate

Tax may be imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. Sec. 2001(a). The decedent's taxable estate is the value of the decedent's gross estate reduced by various deductions. Sec. 2051. One of those deductions is for claims against the estate that are enforceable under State law. Sec. 2053(a)(3); Propstra v. United States, 680 F.2d 1248, 1254-1255 (9th Cir. 1982).

An estate may deduct the value of a claim based on a decedent's promise to pay only if the liability was contracted bona fide and for full and adequate consideration in money or money's worth. Sec. 2053(c)(1)(A); Estate of Scholl v. Commissioner, 88 T.C. 1265, 1279 (1987); Estate of Davis v. Commissioner, 57 T.C. 833, 835 (1972). This requirement prevents an individual from reducing her or his taxable estate through transactions that are in substance gifts. Commissioner v. Porter, 92 F.2d 426, 428 (2d Cir. 1937), affg. 34 B.T.A. 798 (1936).

2. The Estate's Contentions

The estate contends that the estate may deduct $400,000 on the basis of its obligation to pay the promissory note. The

estate contends that the note was the result of a bona fide contract for full and adequate consideration in money or money's worth as required under section 2053(c)(1)(A). The estate also contends that decedent received full and adequate consideration for her promise to pay Advance Leasing $400,000 because she received 4,000 shares of stock in a corporation that appeared ready to become profitable.

The estate argues that by April 29, 1997, Advance Leasing had experienced a dramatic turnaround. The estate points out that, in contrast to its losses for 1994, 1995, and 1996, Advance Leasing reported $29,663 of taxable income before net operating loss deductions on its 1997 income tax return.

3. Whether Decedent Received Full and Adequate Consideration for the Stock Subscription Agreement

We first decide whether decedent's receipt of 4,000 shares of Advance Leasing stock on April 29, 1997, was full and adequate consideration for her agreement to pay $400,000 to Advance Leasing under the stock subscription agreement.[6]

The estate contends the 4,000 shares of stock were adequate consideration because Advance Leasing's financial situation improved dramatically from 1996 to 1997. Advance Leasing reported $29,663 of taxable income before net operating loss

---

[6] The estate contends that the burden of proof in this case is shifted to respondent under sec. 7491(a). We need not decide that issue because we decide this case on the basis of the preponderance of evidence without regard to the burden of proof.

deductions on its 1997 income tax return. However, that return is not consistent with its financial statements, which show a net loss of $20,875 before net operating losses are considered.

The estate contends the funds from the stock subscription agreement reduced Advance Leasing's debt obligations, made the balance sheet cleaner, and made it easier for the company to secure outside financing. Despite this claim, Advance Leasing did not receive the funds until after decedent died.

Advance Leasing's financial situation remained poor on April 29, 1997. James McBride (an attorney for Advance Leasing and the brother of McBride) testified that Advance Leasing and its business had negligible, if any, value when the stock subscription agreement was entered into on April 29, 1997. James McBride advised his brother regarding the stock subscription transaction, and he drafted the stock subscription agreement and the $400,000 promissory note. James McBride stated that it would have been futile for HELP to demand full payment by Advance Leasing because Advance Leasing lacked the ability to repay the more than $864,000 it owed to HELP at the end of 1996. James McBride testified that HELP wanted Advance Leasing to survive in the hope that it would generate income and repay its debt to HELP.

James McBride's testimony is corroborated by the estate tax return for the Estate of Bob Hughes and the Advance Leasing

financial statements.  According to the estate tax return for the Estate of Bob Hughes, the stock of Advance Leasing had a fair market value of zero as of April 10, 1996.  Advance Leasing had net losses of $66,672 for 1994, $50,995 for 1995, and $40,526 for 1996.  Even taking into account decedent's $400,000 note, Advance Leasing had a negative total net worth of $22,110 at the end of 1997 and $23,356 at the end of 1998.[7]

Advance Leasing used the entire $400,000 it received in 1999 from decedent to repay some of the more than $900,000 it then owed to HELP.  Thus, the $400,000 payment to HELP directly benefited decedent's children and grandchildren.

We do not believe that the value of Advance Leasing's stock increased from zero on April 10, 1996 (as reported on the estate tax return for Bob Hughes which McBride signed) to $400,000 on April 29, 1997, and then fell to zero on July 25, 1999 (the date decedent died, as reported on decedent's estate tax return also signed by McBride).  We conclude that the 4,000 shares issued to decedent had little or no value when McBride signed the stock subscription agreement on April 29, 1997.[8]  Thus, decedent did not receive full and adequate consideration as required by section

---

[7]  As discussed <u>supra</u>, Advance Leasing's 1997 and 1998 financial statements did not reflect the additional 4,000 shares issued to decedent and the $400,000 stock subscription agreement note payable to Advance Leasing.

[8]  Neither party offered expert testimony on the value of Advance Leasing stock on Apr. 29, 1997.

2053(c)(1)(A) for the $400,000 she agreed to pay Advance Leasing in exchange for the 4,000 additional shares.

4.    Whether the Stock Subscription Transaction Was Contracted Bona Fide

The estate contends that the $400,000 stock subscription agreement (the agreement to pay $400,000 in exchange for 4,000 shares of Advance Leasing common stock) was contracted bona fide. We disagree.

"Contracted bona fide" means made in good faith and bargained for at arm's length.  Secs. 20.2043-1(a), 20.2053-4, Estate Tax Regs.; see Bank of New York v. United States, 526 F.2d 1012, 1015 (3d Cir. 1975); Estate of Morse v. Commissioner, 69 T.C. 408, 418 (1997), affd. 625 F.2d 133 (6th Cir. 1980).  When family members adopt a course of action with the intent to pass on wealth, a deduction for the amount transferred is not permitted under section 2053 unless there was a bargained-for exchange.  Estate of Huntington v. Commissioner, 16 F.3d 462, 467 (1st Cir. 1994), affg. 100 T.C. 313 (1993).  McBride was decedent's attorney in fact and Advance Leasing's sole director and officer; thus, he was on both sides of the stock subscription transaction.  That transaction must be subjected to enhanced scrutiny.  See Bank of New York v. United States, supra at 1016-1017; Estate of Woody v. Commissioner, 36 T.C. 900, 903 (1961).

The estate contends that the stock subscription agreement was bona fide because:  (1) Decedent wanted Advance Leasing to

continue to operate so that Billy Hughes would have a place to work; (2) McBride conducted business in the same way that Bob Hughes did; (3) owners of small businesses typically operate other than at arm's length; and (4) James McBride advised McBride about fiduciary obligations.

Those points do not convince us that the stock subscription agreement was bona fide. McBride's engaging in conduct similar to that of Bob Hughes does not show that the stock subscription agreement was at arm's length or bona fide without a showing that Bob Hughes always acted at arm's length when dealing with his related entities. In addition, whether or not the related entities dealt with each other at arm's length, section 2053(c)(1)(A) provides that the estate is not allowed a deduction in this case unless the claim against the estate was contracted bona fide and for adequate and full consideration. We have no reason to question McBride's intent to act properly or the quality of the legal advice he received; however, that does not determine whether the stock subscription was at arm's length.

The following facts show that the stock subscription agreement, made on April 29, 1997, was not bona fide: (1) The terms of the stock subscription agreement were not negotiated at arm's length; (2) Advance Leasing's business was not appraised, and Advance Leasing had annual net losses and a negative net worth in 1996, 1997, and 1998 both before and after the April 29,

1997, stock subscription transaction; (3) the 4,000 shares and the $400,000 demand note payable to Advance Leasing were not reflected on Advance Leasing's 1997 and 1998 financial statements or on its 1997 and 1998 tax returns; (4) Advance Leasing's bookkeeper and its certified public accountant did not know about the stock subscription agreement and the $400,000 note payable, and (5) Advance Leasing and McBride (its sole officer and director) did not demand payment of the $400,000 before August 20, 1999.

After decedent died, Advance Leasing received and used the proceeds to repay $400,000 to HELP, the family partnership in which certain children and grandchildren of decedent and decedent's husband collectively held a 99.419-percent interest. Considering all the circumstances, we conclude that the stock subscription agreement was a substitute for a testamentary disposition to decedent's children and grandchildren.[9]

---

[9] The estate contends that we should not treat the $400,000 payment as a testamentary disposition because, if decedent had so intended, she could have reduced her estate by $140,000 per year by giving $10,000 to each of her 14 children and grandchildren each year. Regardless of how decedent might have done things differently, we evaluate the facts before us. See Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 148-149 (1974).

5.    Conclusion

We conclude that the estate may not deduct $400,000 from decedent's gross estate as a claim against her estate under section 2053(a)(3) based on the $400,000 promissory note.[10]

B.    Whether Decedent's Gross Estate Includes $21,782 of Accrued Interest Owed by Advance Leasing on Certain Notes

Decedent's estate included in the gross estate $150,000 representing the principal amount that Advance Leasing owed on its notes to H & R Properties and the Trust.  However, the estate did not include in the gross estate $21,782 representing accrued interest that Advance Leasing owed on those notes when decedent died.[11]

The gross estate includes the value, at the time of death, of all property in which decedent had an interest.  Secs. 2031(a), 2033.  The $21,872 of accrued interest is included in decedent's gross estate to the extent that it had value at the time of her death.  See secs. 2031(a), 2033.

Fair market value is "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both

_____

[10]  In light of this holding, we need not decide respondent's other arguments that the note was not bona fide or enforceable against decedent's estate under Washington law or that decedent lacked competence to execute the power of attorney.

[11] The estate did not elect the alternate valuation date under sec. 2032.

having reasonable knowledge of relevant facts.'" United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.). The fair market value of a note is generally the amount of the unpaid principal, plus interest accrued to the date of a decedent's death, unless the executor establishes that the value is lower or that the note is worthless. Sec. 20.2031-4, Estate Tax Regs. The fair market value of the accrued interest is the amount of unpaid accrued interest as of the date of decedent's death unless the executor establishes a lower value. See id.

Respondent contends that decedent's estate includes $21,782 of accrued interest owed by Advance Leasing because: (1) Advance Leasing could have used the $400,000 to pay $21,782 of accrued interest; or (2) decedent could have reduced the $400,000 owed under the stock subscription agreement note against the $21,782. We disagree. We believe that the fair market value of the accrued interest is zero because: (1) Advance Leasing was insolvent;[12] and (2) we do not believe that a willing buyer with knowledge of Advance Leasing's financial situation would pay any amount for the $21,872 of accrued interest owed by Advance Leasing. We conclude that the $21,782 of accrued interest had no

---

[12] Respondent acknowledges that Advance Leasing was insolvent and that its liabilities exceeded its assets during 1999.

value on the date of decedent's death and is not included in her gross estate.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.